UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


JULIE Y. LUND,                                              CIV. NO. 13-113 (JSM)

     Plaintiff,                                              ORDER

v.

CAROLYN W. COLVIN,

     Acting Commissioner of Social Security,

     Defendant.

     This matter is before the Court on cross motions for summary judgment [Docket Nos. 14 and 17]. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). The parties jointly consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 73. [Docket No. 12].

     The Court, being duly advised in the premises, upon all the files, records and proceedings herein, now makes and enters the following Order:

IT IS HEREBY ORDERED THAT:

    1.    Plaintiff's Motion for Summary Judgment [Docket No. 14] is **DENIED.**

    2.    Defendant's Motion for Summary Judgment [Docket No. 17] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March 21, 2014                          *Janie S. Mayeron*
                                               JANIE S. MAYERON
                                               United States Magistrate Judge

**MEMORANDUM**

## I.    PROCEDURAL BACKGROUND

Plaintiff Julie Lund protectively filed disability insurance benefits ("DIB") on September 2, 2009.  (Tr. 138-140).[1]  Lund alleged an onset date of August 30, 2008, based on a cervical spine fusion at C5-6, depression, anxiety, fibromyalgia, arthritis, asthma, and degenerative disc disease.  (Tr. 159).  The Social Security Administration ("SSA") denied Lund's application on January 5, 2010 (Tr. 61-63), and on reconsideration on July 9, 2010.  (Tr. 64).  Lund requested a hearing pursuant to 20 C.F.R. §§404.929 et. seq. and 416.1429 et. seq.  (Tr. 93-95).  A hearing was held on August 4, 2011, before Administrative Law Judge ("ALJ") Michael D. Quayle.  (Tr. 36-60).  Lund was represented by counsel.  Jesse Ogren, a vocational expert ("VE") testified at the hearing, as did Lund.  (Id.)

On August 30, 2011, the ALJ issued his decision denying benefits.  (Tr. 20-30).  On October 28, 2011, Lund sought a review of the ALJ's decision by the SSA's Appeals Council.  (Tr. 8-19).  On November 13, 2012, the Appeals Council denied Lund's request for review, making the ALJ's decision final.  (Tr. 1-7).  See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§ 404.981, 416.1481.

---

[1]    Lund applied for disability benefits in 2005 and received a partially favorable decision on September 27, 2007, following a hearing before an ALJ.  (Tr. 69-75, 239). The ALJ found Lund disabled from October 22, 2002 to May 1, 2005, but her disability ended on May 2, 2005.  (Tr. 75).

Lund sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. § 405. [Docket No. 1].   The parties have now cross-moved for summary judgment.  [Docket Nos. 14 and 17].

## II.  PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   42 U.S.C. § 1382c(a)(3)(A).   The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.907-09, 416.1407-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher

v. Sullivan, 968 F.2d 727 (8th Cir. 1992).  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  Hilkemeyer v. Barnhart, 380 F.3d

5

441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).   The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939.   The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.   Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).   Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act.   See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).   Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.   See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.   DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step process.   At step one, he determined that Lund had not engaged in substantial gainful activity since August 30, 2008, the alleged onset of her disability.   (Tr. 25).   At step two, the ALJ

found Lund had the following severe impairments: degenerative disc disease with history of fusion procedure, fibromyalgia, arthritis, and asthma.  (Id.).

At step three, the ALJ found that Lund's impairments or combinations of impairments did not meet or equal one of the listed impairments in 20 C.F.R. §404, Subpart P, Appendix 1.  (Tr. 26).  In particular, the ALJ concluded that Lund's mental impairments of anxiety and depression, considered singly and in combination, did not meet or medically equal the criteria of Listings 12.04 (affective disorders) and 12.06 (anxiety disorders), and were not severe.  (Tr. 26-27).  In reaching this conclusion, the ALJ considered whether the "B" criteria of the Listings was met—evidence of mental impairments that resulted in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  (Tr. 26).  The ALJ found Lund had mild restrictions in her activities of daily living, noting that Lund rode her motorcycle, babysat her grandchildren, washed dishes, vacuumed, did laundry, dusted, shopped regularly, prepared simple meals, cared for pets, visited people, went to lunch, attended church and went outside almost daily, depending on the weather.  (Id., citing Tr. 383, 181, 184, 201, 204).

As to social functioning, the ALJ determined that Lund had mild difficulties, noting that Lund could do her own shopping, which indicated that she could go out in public and tolerate superficial interactions with others; appeared friendly and cooperative in a medical examination setting; and reported that she did not have any problems getting along with family members, friends, neighbors or others.  (Tr. 26 citing Tr. 185, 385).

The ALJ found that Lund had mild difficulties with concentration, persistence or pace.  (Tr. 26).  The ALJ noted that the record did not suggest that Lund had any difficulty in this area when she was doing tasks she enjoyed, such as cooking, shopping and going to church.  (Id., citing Tr. 185).

The ALJ concluded that Lund had not experienced any episodes of decompensation, for an extended duration.  (Tr. 26).  Further, the record did not show that Lund had ever left a work-like setting due to psychologically-based symptoms or that she was unable to leave her home.  (Tr. 26-27).

Finding that Lund's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the Paragraph B criteria were not met.

The ALJ also considered whether the evidence established the presence of the C criteria of the Listings,[2] and concluded it did not.  (Tr. 27).[3]

---

[2]     To satisfy the C criteria of Listing 12.04, the claimant must show:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

8

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

To satisfy the C criteria of Listing 12.06, the claimant must show "complete inability to function independently outside the area of one's home."

3    The ALJ stated:

> The undersigned finds that the evidence supports a finding that the claimant is subject to repeated episodes of decompensation; that she has a residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be expect [sic] to cause her to decompensate; nor that she has a current history of one or two years' inability to function outside a highly supportive living environment.

(Tr. 27).

It is clear that the ALJ made a typographical error in this passage, as evidenced by the word "nor" and by the balance of his decision. Lund's argument that the ALJ's decision was "non-sensible" because of this typographical error (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem."), pp. 7-9 [Docket No. 15].) is meritless and will not be addressed further. See Beeks v. Commissioner of Social Sec., 424 Fed. Appx. 163, 164 n.2 (3rd Cir. 2011) (dismissing without any further discussion a claimant's arguments predicated on a typographical error by the ALJ that the claimant had "not engaged in substantial gainful activity" when it was clear the ALJ intended to write that the claimant "had engaged in substantial gainful activity."); Ramsey v. Barnhart, 117 Fed. Appx. 638, 641 (10th Cir. 2004) (summarily dismissing as "frivolous" a claimant's argument that an ALJ's typographical error in stating that Rule 202.21 "directs a conclusion of disabled" when, in fact, the Rule directs a conclusion of not disabled and noting "It is obvious. . .from the ALJ's decision as a whole that the omission of the word 'not' in the ALJ's finding represents a typographical error, rather than a fatal ambiguity in the decision."); Quaite v. Barnhart, 312 F.Supp.2d 1195, 1199 (E.D. Mo. 2004) (noting in the context of the entire decision, it was clear the ALJ found the claimant "can" perform simple and repetitive tasks, not "cannot"). Ironically, after criticizing the ALJ's obvious typographical error here and later when ALJ noted that "the source [Dr. Mark] has considerable experience assessing individuals with mental limitations," when Dr. Mark's opinions related to Lund's physical condition, (Pl. Mem., p. 13 (quoting Tr. 27) (emphasis added)), Lund herself made a couple of typographical errors in her submission to the Court.  For example, she wrote that "there does not exist substantial evidence in the record to support the decision that claimant was able to return to his past work," (Pl. Mem., p. 12), when the ALJ had concluded that Lund could not perform any of her past work, and Lund is a woman and not a man.  (Tr. 29).

Before considering step four, the ALJ determined that Lund had the residual functional capacity ("RFC") to perform sedentary work.  (Tr. 27).  In making this determination, the ALJ considered the opinions of State Agency physicians and psychologists who reviewed the record, examining psychologist, Dr. William Scurry, and Lund's treating psychologist, Ken Martens. (Tr. 22-28).  The ALJ placed significant weight on the opinions of two psychologists who opined that Lund could concentrate on, understand, and remember routine, repetitive, three to four step uncomplicated instructions, and that she could tolerate brief and superficial contact with co-workers and the public. (Tr. 27, citing Tr. 405, 431).

The ALJ also relied on Dr. Scurry's report of his examination of Lund, in which Dr. Scurry opined that Lund could care for her own needs, could understand, remember and follow basic instructions, had limited ability to maintain pace and persistence, and could relate effectively with co-workers and supervisors but might have trouble with the stress and pressure of an entry level position.  (Tr. 28).  The ALJ noted that Dr. Scurry did not state that Lund could not maintain pace or persistence or that she could not handle the stress and pressure of an entry level position.  (Id., citing Tr. 387).

Based on the objective findings in the medical record and Lund's reported activities of daily living, the ALJ placed limited weight on Martens' opinion that Lund had significant mental limitations that would prevent her from meeting competitive standards with respect to carrying out short and simple instructions, maintaining regular attendance, sustaining a routine, performing at a consistent pace, completing a normal workday without interruption from psychologically-based symptoms, responding appropriately to changes in routine, and handling stress.  (Tr. 28, citing Tr. 776-784).

With respect to Lund's physical limitations, the ALJ noted that one state agency physician opined that Lund could work at a light exertional level though she could never climb ladders, ropes, or scaffolds and only occasionally climb ramps and stairs. (Tr. 27, citing Tr. 412).  This physician indicated that Lund could only occasionally balance, stoop, kneel, crouch or crawl.  (Id., citing Tr. 413).  Five months later, another state agency physician found that Lund did not have limitations regarding balancing, stooping, kneeling or crouching, but noted some restriction with reaching.  (Id., citing Tr. 424-425).  The ALJ gave Lund "the benefit of the doubt" and included greater restrictions in his RFC than was indicated by either of these sources.  (Id.).  The ALJ also gave Lund the benefit of some doubt regarding her complaints of pain and physical limitations, but noted that in October, 2009, Lund had a full range of motion throughout all joints.  (Id., citing Tr. 307).

As to Lund's use of medications, the ALJ noted that Lund was taking prescription medication for pain and depression and that there was no evidence to suggest that she failed to receive significant relief of her symptoms as a result of the medications.  (Id., citing Tr. 305, 324, 480, 493).

The ALJ considered Lund's erratic work history before the date of her alleged onset, which indicated that Lund had been out of the work force for reasons unrelated to her alleged disability. (Tr. 29, citing Tr. 151-152).

At the fourth step of the analysis, the ALJ determined that Lund could not perform any past relevant work, such as forklift operator, office clerk, or optometric technician.  (Id., citing Tr. 237-238).

At the fifth step, the ALJ determined that given Lund's age, education, work experience, and residual functional capacity, there were jobs in significant numbers in the national economy that Lund could perform.  (Tr. 29).  In making this determination, the ALJ relied on the Medical-Vocational Guidelines (the "Grids").   20 C.F.R. §404, Subpart P, Appx. 2.  The ALJ concluded that Lund "has the residual functional capacity to perform the full range of sedentary work; considering [her] age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.21." (Tr. 30).

## IV.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Lund challenged the ALJ's decision on the following grounds:  First, the ALJ erred by concluding that Lund's depression and anxiety were not "severe." Pl. Mem., p. 7.  According to Lund, this error resulted from the ALJ's failure to give Martens' opinions controlling weight and the ALJ's failure to comply with 20 C.F.R. §404.1527 by not providing any "valid" reason for rejecting the treating physicians' opinions.  Id., pp. 6-10. Additionally, the state agency physicians did not review the records of Dr. Tapper (Tr. 633-641), Twin Cities Spine (Tr. 476-626), Dr. Harvey (Tr. 627-632), the Owatonna Clinic (Tr. 642-969) or Martens' records, which included his analysis as to Lund's mental health RFC (Tr. 776-784).  Id., p. 11.  These records were entered as exhibits at the hearing, but after the state agency physicians rendered their opinions.  Id., p. 11.

Second, Lund argued that there was not substantial evidence in the record to support the ALJ's decision.  Third, the ALJ erred by failing to consider the debilitating effects of Lund's fibromyalgia, stating "once again. . .the [ALJ] did not give controlling weight to the opinions of the treating doctors and their treatment records." Id., p. 13.

Fourth, Lund argued that the ALJ's statement regarding the relief she experienced from the medications she was taking was unsupported by the record. Id., pp. 15-16. Lund argued that in fact, the record was replete with references that the pain medications were not helping her. Id., (citing Tr. 643-644, 654-655, 681-683).

Fifth, Lund contended that the ALJ was gender-biased "against women and women who are primary caretakers for babies and infants," because he described Lund's work history before the date of the onset of disability as "somewhat erratic" without considering the fact that Lund gave birth to a child in 1982, was pregnant in 1985, gave birth to her second child in 1986, and then did not work outside the home until her younger child started school in 1991. Id., p. 17.

Lastly, Lund argued that the ALJ erred by relying on the Grids. Id., pp. 17-19. Lund contended that she had "considerable" non-exertional limitations and that as a result, the ALJ was required to elicit testimony from the VE regarding the jobs that would be available for a claimant such as Lund, who suffers from both exertional and non-exertional limitations. Id., p. 18.

In response and in support of her own motion, the Commissioner contended that even if the ALJ had erred in his assessment that Lund's depression and anxiety were not severe impairments, the error was harmless because the ALJ found that Lund had other severe impairments, continued through the five-step sequential evaluation, and specifically considered how Lund's mental impairments affected her RFC. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem."), pp. 6-7 [Docket No. 18]. In response to Lund's argument that it was "non-sensible" for the ALJ to conclude on the one hand that Lund could only have brief and superficial contact

with others, and on the other hand conclude that her mental impairments were not severe, the Commissioner noted that the Social Security Regulations provide for that situation precisely. Id., p. 8. (citing SSR 96-8P).[4]

The Commissioner further argued that the ALJ properly weighed Martens' opinions. Id., pp. 11-17. The Commissioner pointed out that Martens only provided approximately nine hours of mental health services to Lund in 2011. Id., p. 11 (citing Tr. 782-84). In July 2011, Martens and Lund jointly filled out a mental impairment questionnaire. Id., (citing Tr. 776-81). In this questionnaire Martens and Lund stated that she suffered from a depressive disorder, not otherwise specified and posttraumatic stress disorder. Id. (citing Tr. 776). They also stated that Lund's highest GAF score[5] in

---

[4]    This regulation states:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

1996 WL 374184, at *5.

[5]    The Global Assessment of Functioning Scale ("GAF"), a scale of 0 to 100, is used by clinicians to report an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (American Psychiatric Assoc. 4th ed. text revision 2000). Scores from 31 to 40 indicate some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. at 34. Scores of 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning. Id. Scores from 61 to 70 indicate some mild symptoms or some difficulty in social,

the last year was 40, when Martens had assigned a GAF of 50 only a few months earlier. Id., (citing Tr. 776, 783). The Commissioner contended that these inconsistent opinions provided a basis for disregarding or discounting Martens' opinion. Id., p. 12 (citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

Further, the Commissioner asserted that Martens' and Lund's notations that she had marked restrictions in activities of daily living; extreme limitations in maintaining social functioning; extreme limitations in maintaining concentration, persistence or pace; experienced four or more episodes of decompensation within a twelve month period; would miss more than four days of work per month and had a

> medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support [accompanied by] [t]here or more episodes of decompensation within twelve months, each at least two weeks long [and] [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

were not deserving of controlling weight because they were conclusory and consisted of a "check the box" format, which was of limited evidentiary value. Id., pp. 12-13 (citations omitted). Additionally, the ALJ had explained why he placed only limited weight on Martens' opinions—because the medical record lacked objective findings to support the extreme degree of limitation Martens had ascribed—and the ALJ had cited to evidence that contradicted Martens' opinions. Id., pp. 13-15 (citing Tr. 26, 28). Likewise, the Commissioner maintained that there was no evidence to support Martens'

---

occupational or school functioning, but "generally functioning pretty well, has some meaningful interpersonal relationships." Id.

statement that Lund had experienced "four or more episodes of decompensation within a twelve month period" as no such episodes were reflected in Martens' treatment notes. Id., p. 15.  Therefore, contrary to Lund's argument that the ALJ failed to provide a valid reason for rejecting Martens' opinions, the record showed that the ALJ explained his reasoning and, in any case, Lund's claims about the severity of her mental condition were not supported by substantial evidence.  Id., p. 16.

As to Lund's complaint that the ALJ gave "controlling weight" to the opinions of state agency physicians who had not reviewed medical records entered into the record after they wrote their opinions, the Commissioner noted that the ALJ did not give the opinions of Dr. Mark and Dr. Moench controlling weight.  Id., p. 17.  Further, Lund failed to explain how the later-submitted medical records undermined the opinions of the state agency physicians.  Id.

The Commissioner contended that Lund waived any arguments regarding her fibromyalgia.  Id.  The Commissioner further maintained that whether Lund actually had fibromyalgia was an open question, as the record reflected that physician Dr. David Tapper considered the fibromyalgia a "working diagnosis and not definitive."  Id. (citing Tr. 236).  The state agency physicians, Dr. Mark and Dr. Moench, both considered Lund's fibromyalgia and concluded that it did not prevent her from working.  Id., p. 17 (citing Tr. 412, 423).  Therefore, while Lund criticized the ALJ for "not giv[ing] controlling weight to the opinions of the treating doctors and their treatment records," Lund did not identify any treating doctors or opinions regarding how her fibromyalgia affected her ability to work.  Id., p. 18.

The Commissioner also disputed that there was no evidence to support the ALJ's conclusion that Lund was helped by her prescription medications. Id. The Commissioner cited to many places in the record in which Lund stated that medications had helped her. Id. Whether another reviewer could draw a different conclusion from the record on whether Lund obtained relief from her medications was irrelevant. Id. There was substantial evidence in the record to support the ALJ's conclusions on this issue, therefore, this argument failed. Id., p. 19.

The Commissioner rejected Lund's argument that the ALJ was biased. Id., pp. 19-21. While the ALJ noted Lund's "erratic" work history, there was no evidence that he was aware that she was out of the workforce to raise children. Id. Lund could have presented evidence regarding her work history and the reasons she was out of the workforce for periods of time, but she did not do so. Id., p. 20.

Finally, the Commissioner argued that the ALJ did not err in relying on the Grids at Step Five of his analysis. Id., pp. 21-23. The Commissioner noted that limiting Lund to "brief and superficial contact with others" did not significantly reduce her RFC to perform the unskilled jobs in the Grids, because the jobs reflected in the Grids "ordinarily involve dealing primarily with objects, rather than with data or people." Id., p. 22 (quoting SSR 85-18).[6] Lund's description of her ability to get along with others supported the ALJ's conclusion that in the work setting, Lund could have brief and superficial contact with others. Id., pp. 22-23.

---

[6]      Available at 1985 WL 56857, at *4.

## V.     THE RECORD

### A.     Medical Records

#### 1.     Twin Cities Spine Center

The administrative record contains records of Lund's treatment at the Twin Cities Spine Center between 2002 and June, 2010. (Tr. 476-626). Lund began treating at the Spine Center following her motorcycle accident in 2001.[7] (Tr. 476). In May, 2004, a physician there told Lund that she had exhausted all non-surgical options for treating her neck pain and that she would be a candidate for an anterior cervical discectomy and fusion at the C5-6. (Tr. 477). This surgery was performed on June 16, 2004 (Tr. 478). At three months post-status, Dr. Francis Denis saw Lund and noted that the x-rays taken that day showed that the anterior plate and anterior graft Lund had received in surgery were in good position. (Tr. 486). At thirteen months post-status, Dr. Denis noted that Lund was doing well overall. (Tr. 489). In February, 2007, Lund returned to Dr. Denis for a review of an MRI on her cervical spine. (Tr. 493). Dr. Denis noted some significant progression of the degenerative disc disease at C6-7. (Id.; see also Tr. 575 (interpretation of MRI performed on February 12, 2007, noting "significant progression of degenerative changes at C6-7)). On April 11, 2010, Dr. Denis performed a discectomy at C6-7. (Tr. 572-573, 577-578). During this surgery Dr. Denis was able to observe the fusion he had performed at C5-6. (Tr. 572). Dr. Denis found the fusion "obviously solid." (Id.). Dr. Denis noted no complications during the discectomy. (Tr. 573).

---

[7]    Lund treated at the District One Hospital in Faribault following this accident. (Tr. 747). Lund was involved in a car accident in 2004, after which she experienced pain in her cervical spine. (Tr. 728-729, 747-757).

On June 21, 2010, at three years post-status, Dr. Denis noted that Lund was reporting neck pain and shoulder pain.  (Tr. 495).  Lund stated that her lower back bothered her when the weather changed.  (Id.).  On examination Dr. Denis found Lund to be mildly tender over the cervical spine posteriorly, but with good range of motion in her neck.  (Tr. 495-496).  Lund filled out a Modified Neck Disability Index the day of her examination, on which she indicated that she was having fairly severe pain, could look after herself, but doing so caused extra pain, she could not read because of severe neck pain, she was having difficulty concentrating, and could hardly do any work or engage in recreational activities due to pain.  (Tr. 533).

### 2.    Owatonna Clinic Records and Referrals

On October 9, 2007, Lund was seen by Dr. Scott Bangs at the Owatonna Clinic for low back pain.  (Tr. 324).  Dr. Bangs diagnosed Lund with chronic neck pain, for which Lund was receiving physical therapy, and a flare-up of low back pain.  (Tr. 325). On November 9, 2007, Dr. Bangs found that Lund's back pain was not improving and refilled her prescription for Vicodin,[8] noting, however, that it was not intended for long term use.  (Tr. 326-327).  On November 21, 2007, Lund had a MRI of her lumbar spine, which was essentially normal.  (Tr. 371).

When Lund saw Dr. Bangs on February 22, 2008, she was working on a temporary basis at a call center where she used a headset and entered information into a computer.  (Tr. 328).  Dr. Bangs noted that Lund had chronic but stable neck pain and was in no acute distress.  (Tr. 329).  Dr. Bangs observed a good range of motion in

---

[8]    Vicodin is a "semisynthetic narcotic analgesic."  Physician's Desk Reference 581 (66th ed. 2012)

Lund's neck and good grip strength.  (Id.).   At a pre-employment physical for Truth

Hardware[9] on April 11, 2008, Dr. Jack Felland found Lund to be pleasant and

cooperative and that she had a good range of motion of the neck.  (Tr. 331).   Dr.

Felland concluded that Lund would have no significant restrictions performing her job.

(Tr. 332).   On May 22, 2008, apparently after beginning her job as an assembler for

Truth Hardware, Lund experienced sore wrists that she attributed to the repetitive

motions of the assembly work.  (Tr. 333).   When Lund was seen in urgent care, she was

advised to ice her wrists several times a day, and the physician prescribed Vicodin, but

told Lund that the prescription would not be refilled and that it was important that she

follow up with her physician.  (Id.).   Lund followed up with Dr. Bangs on June 2, 2008.

Lund indicated that taking four Vicodin a day was the only thing that helped her pain.

(Tr. 334).   On July 18, 2008, Lund told Dr. Bangs that she was continuing to have

trouble with her hands as a result of the repetitive work at Truth Hardware, but Dr.

Bangs observed that that her neck "seemed to be doing pretty good at this point."  (Tr.

336).   Dr. Bangs suggested a test to rule out rheumatoid arthritis as a source of Lund's

fibromyalgia diffuse pain.[10]  (Tr. 337).   On September 3, 2008, Lund saw Dr. Bangs and

reported a flare up of her chronic neck pain and Dr. Bangs recommended an MRI for

evaluation of the pain.  (Tr. 338-339).   Dr. Bangs also noted Lund's "new diagnosis" of

rheumatoid arthritis.  (Id.).   On September 5, 2008, Lund had a MRI of her cervical

---

[9]     Lund was employed by Truth Hardware Corporation in 2008.  (Tr. 143).

[10]     Dr. Bangs' records frequently reference fibromyalgia as one of Lund's medical conditions.   See, e.g., Tr. 305, 311, 313, 315, 324, 328, 334, 336, 342, 346. Nonetheless, Dr. Bangs did not appear to ever actually diagnose Lund with fibromyalgia.  A chart note dated September 23, 2008, by a provider at the MAPS pain clinic where Lund was being treated stated that a chiropractor had diagnosed Lund with fibromyalgia in 1994.  (Tr. 286).

spine, which showed evidence of a right pancentral disk protrusion at the C5-6 level. (Tr. 369).

On September 23, 2008, Lund was seen at the MAPS pain clinic by Reynald Forde, PA-C, for an evaluation and potential treatment of her pain complaints. (Tr. 285-288). Lund reported that she had been to urgent care at least once a few months previously for her pain and had a history of anxiety and depression but had not sought any mental health care. (Tr. 286). Forde reported that Lund sought methadone.[11] (Tr. 286). At the time of her appointment, Lund was working full-time as a machine operator, but had not been at work since August 31, 2008, because of her pain. (Id.). Lund reported that her work was sedentary with minimal stress. (Id.). Ford observed that Lund was alert and oriented, could rise from sitting to standing with minimal difficulty and could walk independently with a normal gait. (Tr. 287). Lund's cervical range of motion was "fairly intact" although she had some minimal complaints of pain. (Id.). Lund was observed to have fine motor coordination. (Id.). Forde assessed Lund with cervicalgia, post-laminectomy syndrome, neuropathic pain syndrome and facet-mediated pain and cervicogenic headaches. (Id.). Forde noted that he told Lund that he would not provide methadone and, in fact, was recommending that Lund cut down on her use of Percocet. (Id.). Forde recommended trigger point injections, possibly epidural steroid injections. (Id.).

On September 10, 2008, Lund had a consultation with Dr. Andrea Bacani, a rheumatologist. (Tr. 363-365). Lund's chief complaint was neck pain, which she rated a

---

[11]     Methadone is a narcotic analgesic.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html

9 out of 10.  (Tr. 363).  Because Lund had an elevated rheumatoid factor on a blood test, Dr. Bacani recommended that the test be repeated.  (Tr. 365).

On September 12, 2008, Lund had a consultation with Dr. John Sherman at Queen of Peace Hospital for increasing pain in her neck.  (Tr. 270).  Lund told Dr. Sherman that she had a "falling out" with Dr. Denis and refused to go back to see him after he refused to provide her with pain medication.  (Id.).  Lund told Dr. Sherman that in the last twelve days her pain was so severe that she had to lie down at all times.  (Id.).  Lund told Dr. Sherman that she had last worked on September 2, 2008, and that she felt she was "totally disabled" and felt that she needed to be on "continual morphine" to control her pain.  (Id.).  Dr. Sherman found that Lund had 75% of full range of motion in all planes with complaints of pain on all ranges of motion.  (Tr. 271).  Further, Lund had 3 out of 5 positive Waddell's[12] signs with significant superficial tenderness, pain on axial loading and generalized overreaction.  (Id.).

Dr. Sherman concluded that Lund had a chronic pain syndrome and that the cervical fusions had failed to resolve her symptoms.  (Id.).  Dr. Sherman recommended that Lund be seen at a nonpharmacologic pain clinic as "this is not a surgical problem."  (Id.).  Dr. Sherman also noted that he would decline to provide Lund with any narcotic pain medication "as I think this would be inappropriate of someone with this type of a florid pain syndrome."  (Id.).

On October 16, 2008, Lund had an injection of Xylocane into trigger points in her cervical spine at the MAPS clinic (Tr. 283-284).  Lund had a steroid injection at the

---

[12]     "Waddel's signs" refers to a set of five physical signs to assist in determining whether lower back pain has a non-organic component. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/

MAPS pain clinic on November 13, 2008, and a steroid injection at the C5-6 on December 2, 2008, at the Minnesota Surgery Center.  (Tr. 277-279, 280-282).

Lund returned to Dr. Bangs on October 20, 2008, reporting that she obtained no relief from the trigger point injections and that her neck pain continued to be severe and constant.  (Tr. 342).  Lund also reported increased anxiety with panic attacks four times a week.  (Tr. 342).  Dr. Bangs prescribed Celexa[13] for Lund's psychological symptoms. (Tr. 343).

On November 1, 2008, Lund went to urgent care at the Owatonna Clinic seeking pain medication for "unbearable pain" in her neck.  (Tr. 344).  Lund asked for a morphine patch or some other form of narcotic patch.  (Id.).  The urgent care physician's assistant was unable to reproduce Lund's pain on palpation.  (Id.)  Lund was prescribed Toradol[14] and advised to follow up with her primary care physician.  (Id.).  The next day, Lund was seen in the District One Hospital in Faribault for neck pain.  (Tr. 719-721). Lund was prescribed Vicodin.  (Tr. 720).  At a follow-up on November 17, 2008, with Dr. Bangs, Lund told Dr. Bangs that the epidural steroid injection had only given her seven hours of relief.  (Tr. 347).  Dr. Bangs found Lund in no acute distress.  (Id.).  At another follow-up on December 17, 2008, Dr. Bangs noted that Lund's use of six Vicodin a day was "too much Tylenol" and that she had been warned of this by the pharmacist.  (Tr. 348).  Dr. Bangs switched Lund to Vicoprofen for her pain and stated that "[w]e will

---

[13]    Celexa is the trade name of citalopram hydrobromide, an antidepressant medication.  http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088568.pdf.

[14]    Toradol is the trade name for Ketorolac, a non-steroidal anti-inflammatory drug used for the short-term relief of moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html

maintain her with no work at this point with a Return-to-Work status form filled out." (Tr. 349).

On January 21, 2009, Lund returned to Dr. Bangs for a follow-up. (Tr. 350-351). Dr. Bangs noted that Lund had been seeing a chiropractor twice a week but apparently without relief. (Tr. 350). Lund had a thoracic MRI, which showed multilevel small disk protrusions, but no other significant abnormality and no nerve root impingement in the thoracic spine. (Id.) See also Tr. 367 (thoracic spine radiology report). Lund told Dr. Bangs that she felt that the Celexa was upsetting her gastrointestinal system and that she stopped taking it. (Id.). To replace the Celexa, Dr. Bangs prescribed Cymbalta.[15] (Tr. 351).

Dr. Bangs saw Lund for another follow-up on March 4, 2009, and Dr. Bangs noted that "[s]he saw the rheumatologist today and apparently they feel like she does not have rheumatoid arthritis." (Tr. 352). Dr. Bangs further noted that Lund's chronic neck pain was doing better with chiropractic treatment with acupuncture and massage. (Tr. 353). Also on March 4, 2009, Dr. Osborn, a rheumatologist, saw Lund following test results that showed Lund had an elevated rheumatoid factor that had increased. (Tr. 361). Dr. Osborn interpreted Lund's lab results and concluded that Lund did not appear to have rheumatoid arthritis. (Tr. 361).

Lund returned to Dr. Bangs on April 15, 2009. (Tr. 354-356). Dr. Bangs noted that Lund was "doing, overall, a little better, along with acupuncture and continued Vicoprofen" with a pain level of 6-7/10, mostly in the base of the neck and posterior shoulders." (Tr. 355). At a follow-up on June 17, 2009, Dr. Bangs found Lund to be in

---

[15]     Cymbalta is the trade name of duloxetine hydrochloride, an antidepressant. http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088579.pdf.

no acute distress and that her neck pain was stable through her use of Vicoprofen.   (Tr.

358).   Lund was awaiting the results of an independent medical examination that she

underwent, apparently in connection with her application for worker's compensation

benefits.   (Tr. 358).   At another follow-up on August 17, 2009, Dr. Bangs again noted

that Lund's low back pain and neck pain had been stable through the use of Vicoprofen.

(Tr. 359).   Lund rated her pain as 6 out of 10.   (Id.).

On September 21, 2009, Lund was seen by Dr. Bangs for a follow-up of her

chronic low back pain and neck pain.   (Tr. 305-306).   Dr. Bangs noted that Lund's pain

had been "on and off" since a motorcycle accident in 2001.   (Tr. 305).   Lund reported

increased hand aches and swollen joints and Dr. Bangs noted that Lund had an

upcoming appointment with rheumatology due to Lund's history of elevated rheumatoid

factor.   (Id.).   Dr. Bangs assessed Lund with chronic low back and neck pain, stable,

and elevated rheumatoid factor with increased arthralgias.   (Tr. 306).   Dr. Osborn saw

Lund on October 7, 2009.   (Tr. 307).   Dr. Osborn's impression was that Lund had

"possible early rheumatoid arthritis" and prescribed a trial of Plaquenil. [16]   (Id.).   Dr.

Bangs' physical examination showed that Lund had a full range of motion throughout all

joints, with some mild tenderness in scattered joints.   (Id.).

Dr. Bangs saw Lund on November 2, 2009 for a follow-up for her pain symptoms.

(Tr. 311-312).   Lund told Dr. Bangs that her pain had somewhat worsened.   (Id.).   Lund

was taking Vicoprofen six times a day.   (Tr. 311).   Dr. Bangs found Lund to be in no

---

[16]      Plaquenil is in a class of drugs called antimalarials.   It is used to treat acute attacks of malaria and is also used to treat rheumatoid arthritis in patients whose symptoms have not improved with other treatments.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html

acute distress, with normal hand and finger movement with normal grip.  (Tr. 312).  Dr. Bangs noted diffuse tenderness of Lund's neck with some posterior shoulder discomfort and tenderness.  (Tr. 312).

On January 13, 2010, Lund saw Dr. Osborn, the rheumatologist, for bilateral hand pain.  (Tr. 318).  Dr. Osborn noted that Lund had been taking Plaquenil, which Lund stated had helped her.  (Id.).  Nonetheless, Lund discontinued its use believing it was affecting her vision—she then began taking the medication again, but had not yet noticed a significant improvement in her hands.  (Id.).  Dr. Osborn's physical exam showed that Lund had full range of motion in her wrists and elbows and "her fists are 100%."  (Id.).

Lund saw Dr. Bangs on February 16, 2010, and Dr. Bangs reported that Lund was unhappy with some paperwork he had completed in connection with her application for benefits.[17]  (Tr. 313-314).  Lund was "not fully happy" with what Dr. Bangs had written and "she does not feel like she can sit for 8 hours and does not feel like she can lift 10 pounds continuously.  She continues to have chronic pain, worse with any activities."  (Tr. 313).  Lund told Dr. Bangs that her pain medications were "somewhat helpful" and that she was taking Vicoprofen, "which does help."  (Id.).  Lund further told Dr. Bangs that she believed that her depression "plays a role as well at times, but she really has not been on anything for that at this point."  (Id.).  Dr. Bangs found Lund in no acute distress, but frustrated that she had been denied benefits.[18]  Dr. Bangs wrote:

---

[17]     This paperwork was not included in the record.

[18]     The Court assumes that Dr. Bangs was referencing the SSA's denial of Lund's application on January 5, 2010 (Tr. 61-63).

[H]ad a long discussion with patient about the paperwork. Discussed that I felt like I was quite restrictive on the paperwork, stating that she could sit for 8 hours, and I explained to her that that is with appropriate breaks, not continuous sitting, and 4 hours standing throughout a shift and 2 hours walking.  Continuing lifting 0 to 10 pounds, occasional 11 to 20 pounds, and never over 20 pounds.  No pushing, pulling or grasping of the wrist.  I explained to her that I could not honestly change that, that this is my medical opinion and this is only a small part of any appeal.  She has had independent medical examination,[19] which have stated similar restrictions, but she still feels frustrated, as she feels like she is disabled and cannot work.  Also discussed that if the depression continues to be a problem she will need to be back on medications and that certainly may be a consideration in the disability appeal that they will evaluate.

(Tr. 314).

Lund saw Dr. Bangs on June 9, 2010, at which time he noted that Lund was having a lot of difficulty with pain, with some increased neck pain.  (Tr. 681). Additionally, Dr. Bangs found that Lund's depression was not fully controlled.  (Id.). Although Lund had been taking Wellbutrin, she was not fully consistent in taking it, as she felt it had not been working well.  (Id.).  Dr. Bangs prescribed Cymbalta in lieu of Wellbutrin.  (Id.).  Dr. Bangs explained to Lund that he was not comfortable continuing with the long term use of narcotics for Lund's pain symptoms and that she would need to be seen at a pain clinic.  (Tr. 683).  Dr. Bangs noted "over the next few months, if she needs to continue the Vicoprofen, that will have to be through the pain clinic and not me."  (Id.)

---

[19]     As there is no independent medical examination ("IME") in the record, the Court believes that Dr. Bangs may be referring to an IME completed in connection with Lund's worker's compensation claim or Dr. Mark's Physical RFC Assessment, which was completed a month earlier.  Dr. Bangs' description of how he filled out this form is consistent with Dr. Mark's findings.

In July, 2010, Lund saw Dr. Bangs for a follow-up and Dr. Bangs noted that Lund had been having a "rough time."  (Tr. 678).  Lund had tried to stop smoking, but had gained weight and could not afford to take the Cymbalta, which had been prescribed for her depression.  (Tr. 678).  Lund's primary complaint appeared to be depression, although Dr. Bangs found Lund to be in no acute distress.  (Tr. 679).

On August 10, 2010, Lund went to a family practice clinic in Waseca[20] where she was seen by Dr. Giovaninna de la Cruz.  (Tr. 702-703).  Dr. de la Cruz noted that Lund was "very disorganized" and attempted to give her entire medical history, but "move[d] back and forth and jump[ed] all over about chronic pain after a motorcycle accident back in 1994."  (Tr. 702).  Dr. de la Cruz attempted to refer Lund to physical therapy, but Lund told her that she would return to a chiropractor, even though she also told the doctor that it was the chiropractor who had caused her problems.  (Tr. 703).

On October 6, 2010, Lund had a consultation with Dr. Osborn.  (Tr. 671).  Dr. Osborn noted that Lund's inflammatory arthritis was "doing well" and that she did not have any joint swelling.  (Id.).  Lund told Dr. Osborn that she had been taking the Plaquenil, but only intermittently and then stopped taking it for "perhaps two to three months."  (Id.).  Dr. Osborn wrote that Lund described at length her back and neck pain and

> she complains to me that she cannot take other medicines and medicines that I suggested.  Her main relief is from Vicodin and she would like to continue on that.  She is taking up to eight tablets per day.  I explained that I would be willing to prescribe 180 pills per month with refills, but if she overuses it, she will get none until I see her back in 6

---

[20]    There is nothing in the record to indicate why Lund went to the Waseca clinic. The chart notes indicates that she was "new patient" who had an extensive history of treatment at the Owatonna clinic.

> months, and that would be the end of the prescription. I am not sure she completely followed that conversation and seemed be more interested in just getting the prescription.

(Tr. 671-672).

Lund saw Dr. Bangs on November 2, 2010, for a follow-up of fibromyalgia and chronic pain "as well as multiple other somatic symptoms." (Tr. 659-666). Lund complained of neck pain, low and mid-back pain. (Tr. 659). On exam, Dr. Bangs found Lund in no acute distress, but significantly frustrated by her pain symptoms. (Tr. 660). Dr. Bangs talked with Lund about weaning her off Vicoprofen, concerned that it was contributing to her symptoms, but Lund was resistant, concerned that Vicoprofen was the only thing that was helping with her pain. (Tr. 661).

Lund saw Dr. Bangs on November 30, 2010, complaining of severe back pain, which she had been experiencing for two weeks without known injury. (Tr. 654-658). Dr. Bangs found that Lund's range of motion was significantly limited secondary to her pain. (Tr. 655). Dr. Bangs noted that Lund was scheduled for an orthopedics consultation the next day. (Id.).

On December 1, 2010, Lund had a consultation with Dr. William Sisco, an orthopedist. (Tr. 649-653). Dr. Sisco noted that Lund sought a consultation because of significant back and referred leg pain. (Tr. 649). Dr. Sisco further noted that Lund was "really not able to walk" as a result of the back pain. (Id.). On examination, Dr. Sisco found Lund to be alert and oriented, but appearing to be in considerable discomfort. (Tr. 650). Dr. Sisco noted that Lund was taking Vicoprofen and "wants additional. I am disinclined to do so." (Id.). Dr. Lund further noted "second opinion from Dr. Dennis [sic] in the Twin Cities." (Id.).

Lund had a rheumatology consult on February 9, 2011, with Dr. Osborn.  (Tr. 643).  Dr. Osborn discussed pain medication with Lund and noted that "most everything I discussed with her she did not feel was worth taking."  (Id.).  Dr. Osborn wrote that he had "no other solutions for her lumbar spine" and that he did not have "anything other to offer her for her back pain.  She requested a couple of things."  (Tr. 643-644).  Dr. Osborn suggested a psychiatrist, but Lund "did not wish to see a psychiatrist or did not pick up on that."  (Tr. 644).

In early March, 2011, Lund had her gallbladder removed laparoscopically, and without event.  (Tr. 440, 454, 704-707).  On March 27, 2011, Lund was seen by Dr. David Tapper at the Allina Hospitals & Clinics Faribault clinic.  (Tr. 444-451).  Lund told Dr. Tapper that she hurt "everywhere" and that she couldn't even be touched by anyone without "bending over in terrible pain."  (Tr. 444).  Lund took a depression screening questionnaire, on which she indicated that her depression symptoms made it "very difficult" for her to work, take care of things at home or get along with others.  (Tr. 445).  Lund's depression was rated "severe."  (Id.).  Dr. Tapper ordered blood tests and Lund visited with him for a follow-up on those tests on March 29, 2011.  (Tr. 452).  Dr. Tapper noted "labs look normal and there was normal [sic][21] lab value that could explain her severe constant, everyday pain with everything she does.  We discussed the diagnosis and treatment options for fibromyalgia."  (Tr. 452).  Dr. Tapper prescribed Lyrica[22] "consistent with fibromyalgia."  On May 13, 2011, Dr. Tapper noted that Lund did not

---

[21]   The Court assumed this was a typographical error and Dr. Tapper intended to write "there was no lab value that could explain her severe constant, everyday pain with everything she does."

[22]   Lyrica is the trade name for pregabalin, and is used to treat pain associated with fibromyalgia.  http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152825.pdf

want to work with rheumatology anymore, as she was not finding it helpful.  (Tr. 633).

Lund stated that she was not able to function well, though pain medications were of

some help.  (Id.).  Dr. Tapper administered another depression screening and Lund's

depression was rated "moderately severe."  (Tr. 634).  A few weeks later, on May 26,

2011, Dr. Tapper saw Lund again and noted no new concerns.  (Tr. 636).  A depression

screening administered at that visit rated Lund's depression as "moderate."  (Tr. 637).

On July 1, 2011, Dr. Tapper addressed a letter "to whom it may concern" in

which he stated that he made a "presumptive" diagnosis of fibromyalgia because Lund

exhibited 11 different trigger points, as well as diffuse myofascial pain.  (Tr. 236).  Dr.

Tapper noted "I still, however, consider this a working diagnosis and not definitive.  I am

continuing to work with her to help improve her function."  (Tr. 236).

### 3.  Chiropractic Records

Lund treated with the Beschnett & Harvey chiropractic clinic in November, 2010.

(Tr. 627-632).  Lund's chief complaint was headaches.  (Tr. 627).  On November 2,

2010, Dr. Harvey observed a poor range of motion through all planes in the neck.  (Id.).

Dr. Harvey did gentle manipulation of Lund's cervical spine, to which Lund responded

"nicely."  (Id.).  Lund saw Dr. Harvey again on November 2 and 8, 2010, and Dr. Harvey

noted that he was treating her neck with heat and manipulation.  (Tr. 628).  On

November 29, 2011, Lund presented with acute lower back pain.  (Tr. 629).  Dr. Harvey

recommended that Lund apply ice and take whatever pain medication she had at home.

(Id.).  Dr. Harvey noted "[s]he asked several times if I knew of any doctor that could

prescribe Vicodin and I told her certainly if she was not improved quickly, we would refer

her to an orthopedist that could choose his method of pain control."  (Id.).  Lund

presented the next day with even worse pain.  (Id.).  Dr. Harvey urged her to see her family doctor.  (Id.).

### B.   Psychology Records

Lund underwent an initial assessment at Associates in Psychiatry and Psychology on May 11, 2010.  (Tr. 467-471).  Whoever performed the intake (the signature is illegible) indicated that Lund had a current GAF of 60 and a highest GAF in the last year of 62.

On May 24, 2010, Lund saw Dr. Kimberly Wernsing at the Open Door Health Clinic.  (Tr. 474-475).  Dr. Wernsing noted that Lund told her that she wanted to stay in bed all day and that she was having difficulty sleeping because of her neck and back pain.  (Tr. 474).  Dr. Wernsing noted that Lund had been taking Wellbutrin and had some minimal improvement with that.  (Id.).  Lund told Dr. Wernsing that she would consider counseling.  (Tr. 475).

On February 18, 2011, Lund visited psychologist Martens for an intake appointment.  (Tr. 782-783).  In the category of "presenting problems" Martens stated that Lund was having issues with Post Traumatic Stress Disorder ("PTSD") as a result of incidents from her childhood and that she had mood swings and anxiety.  (Tr. 782).  Martens diagnosed Lund with depressive disorder, not otherwise specified, and borderline personality disorder and assigned a GAF of 50.  (Tr. 782-783).  Lund saw Martens on six other occasions between February 23 and June 22, 2011 (Tr. 783-784).

On February 23, 2011, Martens noted that Lund had taken "the Millon."[23]  Based on the test results, Martens diagnosed Lund with Depressive Disorder, PTSD, Anxiety

---

[23]     This refers to the Millon Clinical Multiaxial Inventory-III.

Disorder and self-defeating behavior (Borderline Personality Disorder).  (Tr. 783).  On March 15, 2011, Lund told Martens that she had back pain, which exacerbated her depressive symptoms and reported being moody and irritable.  (Id.).  On March 22, 2011, Lund expressed feelings of helplessness and hopelessness and again stated that her back pain was exacerbating her depression.  (Id.).  On March 29, 2011, Lund stated that her medications were not helping her and Martens observed that Lund exhibited anger, sadness, laughter and flat affect.  (Tr. 784).  On April 19, 2011, Martens reported that Lund was sad because a recent business venture had been negatively impacted by the weather.[24]  In several sessions with Martens, Lund discussed her application for SSI, stating "she has not heard from social security.  Her hopes are high, but her patience is getting thin" (May 2, 2011) and "she is hopeful that her court hearing for her Social Security appeal will be overturned and that her financial stress will be lifted." (June 22, 2011) (Tr. 784).

On July 20, 2011, Lund and Martens filled out a Mental Impairment Questionnaire, which was directed to Lund's lawyer.  (Tr. 784) ("Julie helped fill out her

---

[24]     This business venture appeared to be "Northern Creative Concepts," which Lund listed on a resume as a business she owned from October 15, 2003 "to the present." (Tr. 233).  Lund submitted this resume in connection with her application for benefits. This submission was dated in the record as March 16, 2011.  Lund's description of this business was as follows:

> Designed and patented a cold weather garment.  Business entails dealing with current customers, data entry, filing, organizing, follow up calls, created a business plan, created business cards and brochures, wholesale and retail sales and presentation demonstrations.

(Id.).

questionnaire for her SSDI court hearing coming up in Aug."); Tr. 776-782 (Mental Impairment Questionnaire).[25]

On this questionnaire, Martens assigned Lund a GAF of 40 and indicated that her highest GAF of the previous year was 40. (Tr. 776). Under "clinical findings," Martens wrote that Lund had trouble concentrating, memory problems, fatigue, crying spells, eating disturbances, sleep disturbances, Lund's symptoms were exacerbated by pain, and Lund had intrusive memories from traumatic experiences and social isolation. (Id.). Martens stated that Lund's prognosis was "poor." (Id.). Regarding Lund's symptoms, Martens checked that Lund had appetite disturbance; decreased energy; blunt affect; feelings of guilt or worthlessness; generalized, persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent, intrusive recollections of traumatic event; persistent disturbances of mood or affect; apprehensive expectation; emotional withdrawal or isolation; emotional lability; vigilance and scanning; easy distractibility; memory impairment and sleep disturbances. (Tr. 777).

Under the category of "Mental Abilities and Aptitudes Needed to Do Unskilled Work," Martens checked that Lund would be unable to meet competitive standards in the following categories: carrying out short and simple instructions; maintaining attention for a two-hour span; maintaining regular attendance; sustaining an ordinary routine without special supervision; working in coordination or proximity to others without being unduly distracted; being able to complete a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without unreasonable rest breaks; responding appropriately to changes in a routine

---

[25]    This Court does not know how much input Lund provided in completing the form. The Court will assume that Martens was responsible for the clinical findings and GAF.

work setting; dealing with normal work stress; understanding and remembering detailed instructions, carrying out detailed instructions; setting realistic goals; dealing with the stress of a semiskilled and skilled work; interacting appropriately with the public; and traveling in an unfamiliar place.  (Tr. 777-779).  Martens indicated that Lund had "limited but satisfactory" ability to remember work-like procedures; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions.   (Tr. 778).   Martens checked boxes indicating that Lund was "seriously limited but not precluded" from carrying out very short and simple instructions; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness and using public transportation.  (Tr. 778-779).

In support of these findings, Martens wrote that Lund's "symptoms would impair her ability to remember & concentrate;" she would "likely miss work due to emotional problems;" "she is isolative & the pressure of would likely stress her out to the point of her not functioning or leaving the job site;" and "she is isolative, is irritated by people. She could not concentrate or remember enough to plan the use of public transportation."   (Tr.  778-779).   Martens further opined that Lund's depressive symptoms were exacerbated by her physical symptoms and her physical symptoms were likely exacerbated by her emotional problems.  (Tr. 779).

Regarding functional limitations, Martens checked the boxes indicating that Lund had "marked" restrictions on her activities of daily living, and "extreme" difficulties in

maintaining social functioning, concentration, persistence or pace, and that Lund had experienced four or more episodes of decompensation within a twelve month period, each of at least two weeks duration.  (Tr. 780).  Martens also checked that Lund had a medically documented history of a chronic organic mental or affective disorder of at least two years duration that has caused more than minimal limitations, three or more episodes of decompensation within twelve months and "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in demands or change in the environment would be predicted to cause the individual to decompensate."[26]  (Id.).  Martens estimated that Lund would miss more than four days of work a month due to her impairments and that Lund's impairments lasted or could be expected to last at least twelve months.  (Tr. 781).

### C.   State Agency Physicians' Opinions

#### 1.   Psychiatric Assessments

On December 3, 2009, State Agency consulting psychologist Dr. William Scurry examined Lund and completed a Mental Status Examination and Description of Daily Functioning Assessment of Lund.  (Tr. 383-387).  Dr. Scurry noted that Lund told him that she had last worked in September, 2008 as a machine operator, but had to leave that job because she injured her back.  (Tr. 384).  Lund reported that she left her job at Malt-O-Meal where she had worked for over seven years when she was diagnosed with a herniated disk in her neck.  (Id.).  Lund told Dr. Scurry that she had difficulty with any sort of physical activity and that she had been diagnosed with arthritis and fibromyalgia, which limits her to standing and sitting for fifteen minutes at a time.  (Id.).  Lund further

---

[26]   This form, which appeared to have been provided by Lund's attorney, reflects the language found in the "C" criteria of Listing 12.04.

reported that she continued to ride her motorcycle around town for short trips.  (Id.).
Lund stated that her physical diagnoses were fibromyalgia, rheumatoid arthritis and disk
herniations in her spinal region.  (Id.).  Lund stated that she did not suffer from
depression, even though depression was listed in her medical records.  (Id.).  Lund
stated that her current medications were Vicoprofen, Plaquenil, Protonix[27], and
Flexeril,[28] which Lund stated were working "okay."  Lund reported that she believed that
she related well to others when working and had no problems adjusting to co-workers or
supervisors.  (Tr. 385).

Dr. Scurry observed that Lund was friendly and cooperative throughout the exam
and seemed to have no trouble communicating her thoughts.  (Tr. 385).  Lund was able
to maintain a train of thought to completion without evidence of distraction or
interruption.  (Id.).  Lund told Dr. Scurry that she believed she lived in a "haunted house"
for three years and heard noises that others discounted.  (Tr. 385-386).  Lund reported
that she had not heard voices for a year or so and denied that the voices ever spoke
directly to her.  (Tr. 386).  Lund described her current mood as "up and down" but said
she did not believe that she suffered from depression.  (Id.).  If she did suffer from
depression, it was not so severe that it limited her ability to function.  (Id.).

Dr. Scurry found Lund well oriented and with generally average intellectual
ability, although he noted that the problems posed to her regarding social judgment and
problem solving challenges were met with "mixed results."  (Tr. 386).

---

[27]     Protonix is used for the short term treatment in the healing and relief of
symptoms of acid-related damage to the esophagus.  http://www.protonix.com/

[28]     Flexeril is a muscle relaxant.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html

Dr. Scurry's summary and diagnosis stated that Lund reported that her medications were effective and that Lund could perform light housekeeping chores as long as she could take breaks and avoided static standing. (Id.). Lund told Dr. Scurry that she could drive, do laundry and watch her granddaughters a couple of hours per week, though she was exhausted after doing do. (Tr. 387). As to Lund's report about hearing voices, Dr. Scurry noted that "these would likely be misperceptions and seemed to lack the more florid content of first rank symptoms." (Id.). Dr. Scurry further noted "[Lund] does not consider herself depressed and her daily functions are not interrupted or negatively influenced by the same." (Id.). Further, Dr. Scurry opined:

> Ms. Lund impresses as having the mental capacity to understand, remember, and follow basic instructions. She would seem to have at this time a reduced mental capacity for maintaining appropriate pace and persistence at tasks, likewise for concentration and attention span. Ms. Lund would likely have an adequate mental capacity for relating effectively with co-workers and supervisors but perhaps a reduced mental capacity for tolerating stress and pressure of an entry level position.

(Id.). Dr. Scurry diagnosed Lund with adjustment disorder with depressed mood, mild and assigned her a GAF of 53. (Id.).

On December 31, 2009, state agency psychologist Dr. Thomas Kuhlman completed a Psychiatric Review Technique form on Lund. (Tr. 389-402). Dr. Kuhlman checked a box indicating that "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above (12.04 Affective Disorders) [:] Adjustment disorder with depression and anxiety." (Tr. 392). Dr. Kuhlman found that Lund had mild restrictions on her activities of daily living and difficulties in maintaining social functioning, moderate limitations in maintaining concentration, and had

experienced no episodes of decompensation, each of extended duration.  (Tr. 399).  Dr. Kuhlman stated that Lund alleged that she was suffering from degenerative disc disease, depression, anxiety, fibromyalgia, arthritis, and asthma.  (Tr. 401).  Dr. Kuhlman noted that Lund had told Dr. Scurry about living in a haunted house, but that Dr. Scurry did not find any evidence of psychosis.  (Tr. 401).  Dr. Kuhlman also noted Dr. Scurry's diagnosis of adjustment disorder with depressed mood-mild and the GAF of 53.  (Tr. 401).

Dr. Kuhlman completed a Mental RFC on Lund.  (Tr. 403-406).  In the category of "Understanding and Memory," Dr. Khulman found Lund "not significantly limited" in her ability to remember locations and work-like procedures, the ability to understand and remember short and simple instructions and detailed instructions.  (Tr. 403).  In the category of "Sustained Concentration and Persistence," Dr. Kuhlman found Lund not significantly limited in her ability to carry out short and simple instructions or detailed instructions; and moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and to complete a normal workweek without interruptions from psychologically-based symptoms.  (Tr. 402-403). Dr. Khulman found Lund not significantly limited in her ability to sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted and to make simple, work-related decisions.  (Id.).  Dr. Kuhlman found Lund moderately limited in her ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 404).

In the category of Social Interaction, Dr. Kuhlman found Lund moderately limited in her ability to interact appropriately with the general public, but not significantly limited in her ability to ask simple questions and ask for assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers; and to maintain socially appropriate behavior.  (Tr. 404).  In the category of Adaptation, Dr. Kuhlman found Lund not significantly limited in her ability to respond appropriately to changes in the work place; to be aware of and take precautions regarding normal hazards; to travel in unfamiliar places and take public transportation; and to set realistic goals or make plans independently of others.  (Id.).

Dr. Kuhlman concluded that Lund had the following Mental RFC: sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but markedly impaired regarding detailed or complex/technical instructions; marked limitations in her ability to complete complex/technical tasks; a reduced ability to handle co-worker and public contact, but adequate to handle brief and superficial contact; reduced ability to tolerate and respond appropriately to supervision, but adequate to handle ordinary levels of supervision found in a customary work setting; reduced ability to handle stress and pressure in the work place but adequate to handle the stresses of a routine repetitive 3-4 step work setting. But Lund could not handle the stresses of a detailed or complex work setting.  (Tr. 405).

Dr.Kuhlman's opinions were affirmed by Dr. Jay McNamara on July 8, 2010.  (Tr. 432).

### 2.    Physical Assessments

On January 5, 2010, State Agency consulting physician Dr. Aaron Mark completed a physical RFC assessment on Lund and concluded that Lund could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8 hour day, sit about six hours in an 8-hour day. and was unlimited in her ability to push and/or pull.  (Tr. 412).  Dr. Mark factored Lund's cervical fusions, chronic low back pain and neck pain and fibromyalgia into his determination.  (Id.).  Dr. Mark noted that Lund had a full range of motion with mild swelling in some joints.  (Id.).  Dr. Mark further noted that Lund had only experienced limited disruptions to her activities of daily living. (Id.).

Dr. Mark found that Lund could never climb ladders/ropes or scaffolds, could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and had no manipulative, visual, communication or environmental limitations.  (Tr. 413, 421-415). Dr. Mark found Lund to be partially credible regarding her symptoms, citing Lund's care of her young grandchildren, ability to do household chores and prepare her meals, ability to ride her motorcycle and the fact that she swims.  (Tr. 416).  Dr. Mark also cited the fact that Lund could walk a block without tiring and that she had a full range of motion with only mild tenderness in scattered joints  (Id.).

State Agency consulting physician Dr. Keith Moench rendered an opinion on June 10, 2010.  (Tr. 421).  Dr. Moench assigned a "light" RFC and found Lund to be partially credible in her description of symptoms.  (Id.).

Dr. Moench's Physical RFC assessment (Tr. 422-429) reflected the restrictions he referenced in his opinion --- that Lund could occasionally lift 20 pounds, frequently lift

10 pounds, stand and/or walk about 6 hours in an 8 hour work day and sit for about 6 hours in an 8 hour work day and that Lund had unlimited ability to push/pull. (Tr. 423). Dr. Moench found that Lund could occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds and could occasionally crawl. (Tr. 424). Lund could frequently balance, stoop, kneel, and crouch. (Id.). Regarding manipulative limitations, Dr. Moench found that Lund had limited ability to reach in all directions and unlimited ability to handle, finger and feel, but with bilateral overhead reaching limited to "occasional" because of her cervical fusion. (Tr. 425). Dr. Moench found no visual limitations and no communicative limitations. (Tr. 425-426). Regarding environmental limitations, Dr. Moench opined that Lund should avoid concentrated exposure to extreme cold and should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation that could exacerbate Lund's asthma and that she should avoid working around heavy, moving machinery. (Tr. 426). Dr. Moench found that Lund's impairments could reasonably be expected to produce the alleged symptoms, but that the intensity of her symptoms was not consistent with the totality of the evidence. (Tr. 427). "Specifically, [claimant] has stopped seeing physicians [because] they did not think continuing with narcotic pain medications was appropriate. In addition, she has had an exam of 3 of 5 Waddel signs positive indicating a high likelihood of pain being from a nonphysical source." (Tr. 427). Dr. Moench found Lund's statements about her symptoms and their functional effects to be only partially credible. (Id.).

D.    **Adult Function Reports**

Lund submitted two Adult Function Reports in connection with her application for benefits, one dated November 12, 2009 and the other undated.[29]  In the November 12, 2009 Report, Lund reported her activities of daily living as follows: each day she would take her medications, waiting until her pain was under control before she started housework.  (Tr. 180).  If the weather was nice, she would take her grandchildren to the park or go for walk around the block.  (Id.).  Lund reported that she cared for her eleven-month old and four-year old grandchildren once a week for two hours at a time and she cared for her pets without assistance.  (Tr. 181).  Lund checked on the form that she had no problem with personal care, did not need reminders to take her medication, prepared all of her own meals, did dishes, laundry, vacuumed and dusted, but needed assistance with moving heavy furniture and mopping the floors.  (Tr. 182).  Lund stated that she did not do yard work for fear of injuring her back.  (Tr. 183).  Lund reported that she went outside every day, drove a car, shopped for groceries, and could handle a checkbook.  (Id.).  As for hobbies and interests, Lund stated that while she formerly enjoyed motorcycling 100 miles a week, swimming, snowmobiling and playing volleyball, now she could only ride a motorcycle "maybe" ten miles, that it was "more difficult" to swim a pool length and she could no longer snowmobile or play volleyball. (Tr. 184).  Lund reported that she saw friends for lunch or to visit twice a month and would go to her daughter's to visit.  (Id.).  Once or twice a month Lund went to the doctor's office.  (Id.).  As to changes in her social activities since the onset of her

---

[29]    This Report has a facsimile date stamp of April 12, 2010.  (Tr. 199).  Because the hearing in this matter was held on August 4, 2011, the Court assumes that this Report was completed on or about the date it was faxed.

disability, Lund wrote "I don't go to the bar anymore, and my friends that used to ride motorcycles with don't call me anymore because I'm always complaining that I can't ride that far." (Tr. 185).

Lund reported that her condition affected her ability to lift, bend, stand, reach, walk, sit, kneel, climb stairs, her memory, ability to complete tasks, her concentration, and her use of her hands. (Id.). Lund stated that she could walk a block without needing to stop and rest and that in doing so, she would need to rest for twenty minutes. (Id.). As to her concentration, Lund stated that her ability to pay attention depended on what she was doing, that she could not finish things she started, and she was "ok" at following written instructions, but that she probably missed a lot of what was said when trying to follow spoken instructions. (Id.).

A month before Lund completed this Adult Function Report, on October 14, 2009, Disability Examiner Kristeen Olson contacted Lund "to ask about her psych allegations-anxiety and depression." (Tr. 410). Lund told Olson that "she was surprised that they were even on the form. She said in the past she had been prescribed meds for symptoms but it is related to her pain and how mad she is feeling overall. She has not seen a therapist or had MH [mental health] trt [treatment. She said it is not an issue for her, does not impact her ability to work." (Tr. 410).

In the second Adult Function Report, Lund reported that each day she took her pain medications and that her level of daily activity depended on what level of pain she was experiencing after taking the medication. (Tr. 199). On a "good" day, Lund would try to visit her grandchildren. (Id.). If it was nice outside, Lund would try to walk around the block and pace herself with household chores. (Id.). On days when it was going to

snow or rain, Lund's pain level would be uncontrollable.  (Id.).  Lund reported that she prepared her own meals, dusted, did dishes and laundry, although each chore could take her up to an hour to complete.  (Tr. 200).  Occasionally, she would need help from a friend to do her chores.  (Id.).  As to hobbies, Lund reported that she formerly enjoyed vacationing and camping, but that she had not been camping in over eight years and that she vacationed "only in emergency situations."  (Tr. 201).  Lund stated that she regularly went to her daughter's house, to church and Walmart, but that she usually stayed close to home because she needed to put ice on her neck and upper back "24/7" to keep her pain under control.  (Id.).  Lund stated that she did not handle stress well, but that she was learning to be more patient, which lowered her stress level.  (Tr. 202).  Lund stated that she cared for her cats, but that she could no longer go snowmobiling, go to fairs and malls with her family, ride her motorcycle long distances, go on long car rides, read, or babysit her grandchildren.  (Tr. 203).  Lund stated that she could no longer mow her yard due to her pain, although she went outside almost daily, depending on the weather.  (Tr. 204).  Lund stated that she could drive a car, shop, and handle a checkbook.  (Id.).  In addition to the physical limitations noted on the November 2009 Adult Function Report, Lund added that she had trouble understanding and following instructions, reading and writing.  (Tr. 205).  Lund stated that she could only walk for fifteen to twenty minutes at a time and would have to rest for fifteen to twenty minutes if she did so.  (Tr. 205).  Lund reported that she had to read written instructions "over and over" and that she seemed to miss pertinent information if the instruction were oral.  (Id.)

E.     **Hearing Testimony**

Lund testified that she was born in August of 1964, making her 47 years old at the time of the hearing.  (Tr. 39).  Lund obtained her GED and was currently divorced and living alone in an apartment.  (Tr. 40).  Lund stated that she had been receiving disability payments of $1,087 from 2008 to the date of the hearing as a result of a back injury she suffered on the job.  (Tr. 43-44).  However, neither Lund nor her attorney could define with certainty the source of the payments—it was either private disability insurance or worker's compensation.  (Tr. 45-47).

The ALJ solicited testimony from Jesse Ogren, the VE, who testified that Lund's previous jobs were as a forklift operator, office clerk, and optometric technician.  (Tr. 49).  The ALJ asked the VE if Lund was ascribed a sedentary RFC whether she would be able to work as a optometric technician, and the VE replied that she could.  (Id.).  The ALJ then asked Lund why she thought she could not perform a sedentary job.  (Id.).  Lund responded that it was because her pain was so severe – she had bad neck pain and radiating back pain that affected her low back and sciatic nerve.  (Tr. 49-50).  Lund testified that she was taking Oxycodone[30] once every four hours, or about four or five times a day, to treat her pain.  (Tr. 50).  Lund reported that she was treating with Dr. Tapper at the Allina Medical Clinic at Faribault.  (Tr. 50).  The ALJ read into the record the statement by Dr. Bangs on February 18, 2010, which was quoted by State Agency consulting physician Dr. Keith Moenchin in his consulting report.  (Tr. 51).  Dr. Moench wrote that Dr. Bangs told Lund that:

---

[30]     Oxycodone is a narcotic pain medication often combined with aspirin or acetaminophen.  Stedman's Medical Dictionary, Oxycodone (27th Ed. 2000).

> [H]ad a long discussion with patient about the paperwork. Discussed that I felt like I was quite restrictive on the paperwork, stating that she should sit for eight hours and explained to her that it is with appropriate breaks, not continuous sitting; four hours standing throughout a shift and two hours walking; continuous lifting 0 to 10 pounds, occasional 11 to 20 and never over 20; no push, pull or grasping.  I explained to her that I could not honestly change that and this is my medical opinion and this is only a small part of any type of appeal.  She had independent medical examinations which have stated similar restrictions, but she still feels frustrated and she feels like she is disabled and cannot work.

(Tr. 51) (quoting Tr. 421, quoting Tr. 314).  The ALJ asked the VE whether, given those functional limitations, Lund could work as an optometric technician and the VE responded that she could.  (Tr. 52).

Lund further testified that she was being treated for rheumatoid arthritis and that the medications she was taking affected her vision.  (Tr. 53).  Lund further testified that she was taking Vicoprofen[31] four times a day.  (Tr. 53).

The ALJ asked the VE if only routine, repetitive, three and four-step tasks, "nothing complex, nothing technical," with only brief and frequent and superficial contact would affect Lund's ability to work as an optometric technician.  (Tr. 53).  The VE responded that it would.  (Tr. 54).  The VE then stated: "[w]ith the no pushing and pulling and grasping, there's not going to be much left at all.  It'd be the sedentary level and there would likely be. . .I don't [sic] if there are. . .I could find any jobs actually, with no grasping, pulling, pushing." (Id.).

---

[31]    Vicoprofen is a brand name for a medication containing hydrocodone and ibuprofen.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

In response to questioning from her attorney, Lund testified that she suffered from depression caused by her pain and that she had no quality of life. (Tr. 55). Further, if she did not lay down, her pain was so severe it took her breath away. (Tr. 56). Lund stated that she had two fusion surgeries in her neck and had tried to go back to work after an earlier disability application and hearing, but that she had not worked since 2008. (Id.). The ALJ then asked Lund why, "if [she was] as dysfunctional as [she] seemed today," she was drinking and smoking marijuana socially—a fact the ALJ gleaned from a report by Martens. (Tr. 57, citing Tr. 782). Lund vehemently denied this was true. (Tr. 57-58). The ALJ directed Lund to contact Martens for clarification. (Tr. 58).

On August 12, 2011, Lund's attorney submitted a letter to the ALJ clarifying some issues that arose during the hearing. (Tr. 242-243). Lund's counsel submitted documentation that Lund received a payout of $1,176.50 in a stipulated worker's compensation settlement. (Tr. 242). In addition, Lund was receiving $1,087.29 per month in long-term private disability benefits, being paid pursuant to a policy through her former employer. (Id.). Lund's lawyer argued that this was further evidence of Lund's disability. (Tr. 243). Lund's lawyer also submitted a letter from Martens in which he stated that he spoke with Lund about her alleged marijuana use and that she clarified that she had not used marijuana since her teenage years. (Tr. 258). Martens stated that he would correct his intake form to reflect this information.

## VI.   DISCUSSION

### A.   The ALJ Did Not Err in Weighing the Evidence or in Concluding that Lund's Depression and Anxiety Were Not Severe Impairments

Lund argued that the ALJ erred by concluding that Lund's depression and anxiety were not "severe impairments" and in how he weighed the evidence from Lund's treating psychologist, Martens.  Pl. Mem., pp. 6-11.  Because these arguments are intertwined, the Court will consider them together.

The ALJ must consider every medical opinion received, (20 C.F.R. §§ 404.1527(c); 416.927(c)), and the ALJ must resolve the conflicts among the various opinions and reject those conclusions if they are inconsistent with the record as a whole.  Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).  A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record; on the other hand, an ALJ need not accept the treating physician's opinion if it does not meet those criteria.  Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009); see also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) ("Typically, medical opinions from treating sources are entitled to greater weight than are medical opinions from consultative sources.").  Additionally, a treating physician's opinion may be "unreliable if the doctor is sympathetic with the patient and thus 'too quickly finds disability.'"  Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)).  "Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it."  Id. (citations omitted).

A treating doctor's opinion "is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself." Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999). When a treating physician's RFC opinion is not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when those opinions are more consistent with the record as a whole. Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007).

The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)). Consequently, whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Id. (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Id. (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).

An ALJ may consider opinions from non-examining sources on the nature and severity of a claimant's impairments, including those opinions from State agency medical and psychological consultants. See 20 C.F.R. § 416.927(e)(2)(i).

The Court rejects Lund's argument regarding her depression and anxiety for several reasons. First, contrary to Lund's assertion, the ALJ did not "reject" Martens' opinion. (Pl. Mem., p. 11). The ALJ placed "limited weight" on Martens' opinions and fulfilled his obligation to explain why. The ALJ explained that he was placing "limited weight" on Martens' opinions because "the medical record lacks objective findings to

support the extreme degree of limitation Mr. Martens identifies. The claimant's activity level, including babysitting young grandchildren, contradicts his statement that she cannot maintain attention for a two hour segment. Her ability to prepare simple meals indicates that she can carry out short and simple instructions. She has stated that she is able to handle stress and handle changes in a routine." (Tr. 28, citing Tr. 186).

A review of the record establishes that the severe limitations Martens placed on Lund were not supported by any other medical source, whether treating or consulting, and were not supported by the medical record as a whole, including Martens' own records. For example, when Martens filled out the mental impairment questionnaire provided by Lund's attorney on July 20, 2011, he assigned a GAF of 40 and stated that was the highest GAF score for the previous year, (Tr. 776), although five months earlier he had assigned a GAF of 50 (Tr. 783). There is nothing in Martens' notes between February 18, 2011 to July 20, 2011, that would support a diagnostic shift from "serious impairment" to "major impairment" as represented by the shift in GAF scores. In addition, while Martens indicated that Lund had "marked" limitations in her daily living activities and "extreme" limitations in maintaining social functioning, concentration, persistence or pace, there is nothing in his clinical notes that supported those restrictions. Martens' intake note stated that Lund was "alert and fully oriented" and that Lund had applied for SSI benefits as a result of back injuries and neck pain—without any mention of disability due to psychological symptoms. (Tr. 782). Thereafter, Martens saw Lund on February 23, March 15, March 22, April 19, May 2 and June 22, 2011. (Tr. 783-784). Martens' notes regarding these visits reflected that Lund was having some relief from her symptoms as a result of medication and that Lund's recent

engagement in some sort of business venture was negatively impacted by weather (Tr. 783, 784).  It is true that Martens also observed that Lund was tearful, sad, "worried and anxious" and had trouble sleeping.  (Tr. 783, 784).  Nonetheless, Martens never opined in his notes that Lund could not work or was disabled as a result of her depression.

Furthermore, no other psychologist assessed the same severe limitations as did Martens.  <u>See</u> Mental Status Examination dated December 3, 2009 (Tr. 383-387); Psychiatric Review Technique Form dated December 31, 2009 (Tr. 389-402); Mental RFC (Tr. 403-406).  While these more favorable assessments pre-date Martens' mental impairment questionnaire by fourteen months, there is no evidence in the record to support the radical change in Lund's psychological condition or her ability to function in the workplace in the intervening fourteen months.  As the ALJ noted, Lund's self-report of her activities of daily living further contradicted Martens' assessment.  (Tr. 28 citing Tr. 186).

In her November 12, 2009 Adult Function Report, Lund stated that she was babysitting her grandchildren, did all of her own self-cares, did housework, drove, shopped and was swimming.  (Tr. 180-185).  In the undated Adult Function Report, which the Court believes was completed on April 12, 2010, Lund reported that she prepared her own meals, did laundry, dusted, did dishes, regularly went to her daughter's house, church and Walmart and that while she did not handle stress well, she was "learning to be more patient"—implying that she was learning to manage her stress.  (Tr. 199-202).  Lund also reported that she could handle a checkbook, drive and shop.  (Tr. 204).  These reports of her daily activities are at odds with Lund's assertion

on the same report that she had trouble following both written and oral instructions.  (Tr. 45).

In sum, there is no other evidence in the record to support Martens' extreme assessment of Lund and Martens' own clinical notes do not support the extreme limitations he assessed.  Under those circumstances the Court can find no error in how the ALJ weighed Martens' opinions.

Lund's argument that the ALJ erred by finding that her depression and anxiety were not "severe" also fails.  First, as this Court has just concluded that the ALJ properly weighed the various opinions bearing on the severity of Lund's depression and anxiety, the Court finds that the ALJ's conclusion that they are not severe impairments is supported by substantial evidence in the record as a whole.  Second, even if this Court had not reached that conclusion, as the Commissioner noted, at step two of the sequential analysis, the ALJ found that Lund had other "severe" impairments and continued his analysis, considering how Lund's mental impairments affected her RFC. (Tr. 24, 25-29).

In Nicola v. Astrue, 480 F.3d 885 (8th Cir. 2007), the Eighth Circuit considered the effect of an error at the second step of the sequential analysis.  The narrow issue in Nicola was whether the ALJ erred in failing to consider a claimant's diagnosis of borderline intellectual function constituted a severe impairment at step two.  Id. at 887. The Commissioner conceded this was an error, but argued that the error was harmless. Id.  The Eighth Circuit concluded that a diagnosis of borderline intellectual functioning must be considered severe if there is sufficient medical evidence to support the diagnosis and that the ALJ erred in failing to find the claimant's condition a severe

impairment. Id. ("[W]e reject the Commissioner's argument of harmless error.").  Some Courts have interpreted Nicola to mean that an error at step two can never be harmless. See Moraine v. Soc. Sec. Admin., 695 F. Supp.2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe."); see also Stewart v. Astrue, Civ. No. 09–3170, 2011 WL 338794, at *3 (W.D. Mo . 2011 Jan. 31, 2011) ("[I]f the ALJ errs by finding a severe impairment is not severe, the disability determination must be reversed and remanded) (citing Nicola, 480 F.3d at 887); Lamorte v. Astrue, Civ. No. 3:08-03040, 2009 WL 3698004 (W.D. Ark. Nov. 2, 2009) (same).  Other courts, including other courts in this district, have declined to interpret Nicola as establishing a per se rule that any error at step two is a reversible error.  See Snyder v. Colvin, Civ. No. 12-3104 (MJS/JJK), 2013 WL 6061335, at *9 (D. Minn. Nov. 18, 2013) (an error for failing to find a severe impairment at step two of the analysis is harmless if the claimant "makes a threshold showing of any 'severe' impairment [and] the ALJ continues with the sequential analysis process and considers all impairments, both severe and nonsevere.") (quoting Bondurant v. Astrue, Civ. No. 09-328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010) (emphasis in original), aff'd, 444 Fed. Appx. 928 (8th Cir. 2011)); Martin v. Cole, Civ. No. 2:12-2078, 2013 WL 3270578, at *5 (W. D. Ark. June 27, 2013) (acknowledging the split of authority on whether an error at step two requires automatic reversal, noting that "the undersigned is not convinced that Nicola requires automatic reversal" but remanding for other reasons); Johnson v. Commissioner of Social Sec., Civ. No. 11-1268 (JRT/SER), 2012 WL 4328413, at *21-

22 (D. Minn. July 11, 2012) (providing thorough analysis of <u>Nicola</u> and concluding that "an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC.")[32]; <u>Greenemay v. Astrue</u>, Civ. No. 10-4254, 2011 WL 3876307, at *5, n. 3 (W.D. Mo. Aug. 30, 2011) ("The Court does not interpret <u>Nicola</u>. . .as establishing a rule of <u>per se</u> reversibility regarding an ALJ's error at step two."); <u>Lorence v. Astrue</u>, 691 F. Supp.2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity.") (citing <u>Fisk v. Astrue</u>, 253 Fed. Appx. 580, 583 (6th Cir. 2007) ("'when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.'") (quoting <u>Maziarz v. Secretary of Health & Human Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987)).

This Court does not construe <u>Nicola</u> to require reversal and remand for several reasons.  As other courts to consider this issue have noted, <u>Nicola</u> involved a diagnosis of borderline intellectual function, for which precedent existed describing this condition as a severe impairment when supported by medical evidence.  <u>Nicola</u>, 480 F.3d at 887. Borderline intellectual functioning is not at issue here.  Further, although the ALJ did not find that Lund's depression or anxiety were severe impairments, he specifically considered the effect of her mental status on her ability to work.  (Tr. 26-27).  The

---

[32]     The district court overruled objections to Magistrate Judge Rau's Report and Recommendation and adopted the Magistrate Judge's recommendations.  <u>Johnson v. Commissioner of Social Sec.</u>, Civ. No. 1101268 (JRT/SER), 2012 WL 4328389 (D. Minn. Sept. 20, 2012).

sedentary RFC the ALJ assigned reflected Lund's mental state.  The ALJ cited the opinions of state agency psychologists Dr. Kuhlman and Dr. McNamara in concluding that Lund could understand and remember routine, repetitive three to four step uncomplicated instructions and that Lund could tolerate brief, superficial contact with co-workers and the public.  (Tr. 27).  Therefore, while the ALJ did not consider Lund's depression and anxiety "severe," he clearly considered all of the evidence in the record regarding Lund's mental condition (including Martens' opinions) and reduced Lund's RFC accordingly.[33]

### B.   The ALJ Did Not Err in Weighing the Evidence as to Lund's Physical Impairments

Lund also argued that the ALJ erred in weighing the medical evidence because he gave "controlling weight" to the opinions of state agency physicians who did not have the benefit of records from Dr. Tapper (Tr. 633-641), Twin Cities Spine (476-626), Dr. Harvey (Tr. 627-632), or the Owatonna Clinic (Tr. 642-696).  Pl. Mem., p. 11.  Lund noted that these records were submitted after the state agency physicians rendered their opinions and that the ALJ "rejected" these medical opinions.  Id.  Lund's argument fails for several reasons.  As a preliminary matter, the ALJ did not place "controlling weight" on the opinions of state agency consulting physicians Dr. Mark and Dr. Moench. The ALJ placed "significant" weight on their opinions and actually rejected their opinions that Lund could work at a light exertional level.  (Tr. 27).  The ALJ's decision to reduce Lund's RFC to "sedentary" despite the opinions of the state agency physician was to

---

[33]    Implicit in Lund's argument on this issue is her apparent belief that if the ALJ had characterized Lund's depression and anxiety as "severe," he would have concluded that she was disabled.  That is not the case.  An impairment may be severe, but not disabling.

Lund's benefit.  Moreover, Lund did not discuss how the later-submitted records would have affected the state agency physicians' opinions.  Lund simply stated, erroneously, that the ALJ gave controlling weight to the state agency physicians' opinions although they had not reviewed these records.

Dr. Tapper's records from the Faribault Clinic are unremarkable and noteworthy only for fact that he noted Lund's lab results were normal and that her depression ranged from "moderately severe" to "moderate." (Tr. 452, 634, 637).  Dr. Tapper was careful to state in a letter "to whom it may concern" that his diagnosis of fibromyalgia was "a working diagnosis and not definitive."  (Tr. 236).

The Twin Cities Spine records related primarily to Lund's cervical fusions and follow-up care.  The ALJ noted this medical history and wrote "much of this evidence pre-dates the claimant's alleged onset date.  It is also noted that none of this evidence establishes an extended or permanent restriction against working." (Tr. 28).  Dr. Harvey was a chiropractor who treated Lund five times in 2010.  (Tr. 627-632).  Dr. Harvey's records are also unremarkable and noted that Lund was "respond[ing] nicely" to treatment (Tr. 627) and that Lund had "a fairly good response" to the last treatment.  (Tr. 628).  When Dr. Harvey did not notice marked improvement, he referred Lund back to her family practitioner.  (Tr. 629).

The Owatonna Clinic records from 2010 and 2011 (Tr. 642-696) reflect Lund's office visits for back pain, ear pain, Lund's desire for hormone replacement therapy, chronic pain, depression, a sinus infection, dizziness, and tinnitus.  The records relating to Lund's claimed disabling conditions were consistent with the record as a whole and, as previously noted, Lund did not say why she thought any of these records would have

impacted the state agency physicians' opinions.  The medical records did not add any new or additional information that would have warranted a re-review or reexamination by the state agency physicians.  See Lugo v. Commissioner of Soc. Security, Civ. No. 1:11-1744, 2013 WL 708496, at *13 (E.D. Cal. Feb. 26, 2013) (noting that records not considered state agency consultants "do not document any changed conditions or circumstances that would warrant reexamination by the State agency medical consultants.")

Further, these records were part of the administrative record before the ALJ, and there is no evidence that he failed to consider them.  Merely because the ALJ did not specifically refer to the records of Dr. Tapper, Dr. Harvey or the Owatonna Clinic does not mean that he did not consider them.  See Hammond v. Barnhart, 124 Fed. Appx. 847, 851 (5th Cir. 2005) ("The ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it, and the ALJ's decision states explicitly that he considered the entire record in his decision.").

For all of these reasons, the Court rejects Lund's argument that the ALJ erred in weighing the evidence, including records that were generated after the state agency physicians rendered their opinions on the severity of Lund's physical impairments.

## C.    The ALJ's Decision was Supported by Substantial Evidence in the Record

Contrary to Lund's position, this Court finds that the ALJ's decision was supported by substantial evidence in the record.  To begin with, Lund's argument is based on the mistaken assertion that "there does not exist substantial evidence on the records as a whole to support the decision that claimant was able to return to his [sic] past work."  Pl. Mem., p. 12.  The ALJ concluded that Lund could not return to her past

work as a forklift operator, office clerk, and optometric technician.  (Tr. 29).  The ALJ went on to state "[g]iving the claimant some benefit of the doubt, and because the claimant is limited to sedentary work and brief and superficial contact with others, the undersigned finds that she is unable to perform past relevant work."  (Id.)

The Court concludes that substantial evidence in the record supports the ALJ's decision that Lund could work at a sedentary level, with only brief and superficial contact with others.  Lund's self-reported activities of daily living indicated that despite her back and neck pain and depression, she remained fairly active—motorcycling, caring for her pets, doing household chores, visiting her daughter, going to Walmart and church.  (Tr. 199-204).  Lund reported that she handled stress and changes in routine "ok" (Tr. 186) and commented on her adult function report that she was "learning to accept changes and take one day at a time."  (Tr. 202).  Dr. Scurry, who examined Lund on December 3, 2009, found her to be "friendly and cooperative" and noted that Lund had no problems communicating her thoughts, and that she was able to "maintain a train of thought to completion without evidence of distraction or interruption."  (Tr. 385).  Dr. Scurry further noted that Lund told him that her medications were effective and that she could perform light household chores as long as she took breaks and avoided static standing.  (Tr. 386).  Dr. Scurry found that Lund could follow basic instructions, but had a reduced mental capacity for maintaining appropriate pace and persistence.  (Tr. 387).  The ALJ considered this opinion in concluding that Lund had "mild" difficulties with respect to concentration, persistence and pace.  (Tr. 26).  Additionally, Dr. Kuhlman, whose findings were confirmed by Dr. MacNamara, found that Lund could concentrate on, understand and remember three to four step uncomplicated instructions and that

Lund could handle brief and superficial contact with others.  Notably, despite the fact that two state agency physicians opined that Lund could work at the light exertional level, the ALJ reduced Lund's RFC to the sedentary level.  (Tr. 27).

Regarding Lund's subjective complaints of pain, Lund was noted to have good range of motion in February and April, 2008, and on June 21, 2010.  (Tr. 331, 329, 495-496).  On October 7, 2009, Dr. Osborn found Lund had full range of motion through all of her joints.  (Tr. 307).  On November 2, 2009, Dr. Bangs found Lund to be in no acute distress, (Tr. 312), and on January 13, 2010, Dr. Osborn, the rheumatologist, found Lund to have full range of motion in her wrists and elbows.  (Tr. 318).

In 2010, Dr. Bangs opined that Lund could sit for 8 hours with appropriate breaks, and that she could stand four hours, walk two hours, and continuously lifting 0 to 10 pounds, occasionally 11 to 20 and never over 20 pounds with no pushing, pulling or grasping.  (Tr. 313, 314).  When Lund saw Dr. Bangs in July and November 2010, he found her to be in no acute distress.  (Tr. 660, 679).

Taken as a whole, the record before the ALJ indicated that Lund suffered from chronic pain and depression, which limited her ability to work.  The ALJ acknowledged this evidence and reduced Lund's RFC more than the state agency physicians recommended, giving Lund the benefit of the doubt regarding her subjective complaints of pain.

For all of these reasons, the Court concludes that substantial evidence in the record supports the ALJ's determination with respect to the severity of Lund's pain and depression.

### D.    The ALJ Did Not Err with Respect to Lund's Fibromyalgia

This Court finds meritless Lund's argument that the ALJ erred by failing to consider the impact of Lund's fibromyalgia on her ability to work.  Pl. Mem., pp. 12-13. Lund was never actually diagnosed with fibromyalgia, although admittedly her medical records are replete with references to this condition.  Dr. David Tapper considered the fibromyalgia a "working diagnosis and not definitive."  (Tr. 236).  Nonetheless, the ALJ considered Lund's fibromyalgia a "severe" impairment and considered the opinions of state agency physicians Dr. Mark and Dr. Moench, who both considered Lund's fibromyalgia and concluded that it did not prevent her from working.  (Tr. 412, 423).

Lund claims the error lies in the ALJ's failure to "give controlling weight to the opinions of the treating doctors and their treatment records.  Instead he relies on the opinion of the state agencies physicians without regard to treatment records and concludes that the claimant has the residual functional capacity to perform sedentary work."  Pl. Mem., p. 13.  Yet, Lund did not identify and the Court did not find a single treating physician's opinion that was at odds with the state agency physicians' opinions regarding her fibromyalgia.

### E.    The ALJ Did Not Err in His Conclusions Regarding the Efficacy of Lund's Medications

Lund took issue with the ALJ's statement that "the record does not suggest that [Lund] fails to receive significant relief of symptoms with the use of medication."  (Tr. 28).  According to Lund, "[t]here is no explanation how that conclusion follows from the treating medical opinions and the testimony of claimant at the hearing."  Pl. Mem., p. 14. There is substantial evidence in the record to support the ALJ's statement and Court finds no error by the ALJ in connection with this statement.  For example, Lund noted

that Vicoprofen helped her pain, (Tr. 305, 311, 358, 359, 661); Plaquenil helped her

arthritis pain, (Tr. 318); and that Percocet and Vicoden helped with her pain.  (Tr. 342,

350).  Lund told Dr. Scurry on December 3, 2009 that she "believes her medications are

effective at the present time."  (Tr. 386).  At a visit on November 2, 2010, Dr. Bangs

talked with Lund about weaning her off the Vicoprofen, which Dr. Bangs was concerned

was actually contributing to her symptoms, but Lund was resistant.  (Tr. 661).  When

Lund saw Dr. Tapper on March 27, 2011, she told him that she "feels like her

medications help."  (Tr. 444).  It is true that Lund complained at other times that her

prescription medications were not helping her.  (Tr. 643-644, 654-655, 681-683.)

Nonetheless, where, as here, there is substantial evidence in the record to support the

ALJ's conclusions, the Court will not disturb those them merely because there is

substantial evidence that would support a different conclusion.  Buckner, 213 F.3d at

1011; Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (the court "may not

reverse merely because substantial evidence exists for the opposite decision.") (citing

Woolf, 3 F.3d at 1213).

### F.      There is No Evidence that the ALJ's Decision was Tainted by Gender Bias

Lund argued that the ALJ's description of Lund's work history as "somewhat

erratic" evidenced the ALJ's gender-bias and the ALJ erred in failing to develop the

record in connection with Lund's work history.  Pl. Mem., pp. 16-17.  This argument

finds no support in the record.  "'ALJs and other similar quasi-judicial administrative

officers are presumed to be unbiased.'"  Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir.

2011) (quoting Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)); see also Partee

v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011) ("There is a 'presumption of honesty and

integrity in those serving as adjudicators.'" (quoting Withrow v. Larkin, 421 U.S. 35, 47, (1975)).  "A claimant bears the burden of producing sufficient evidence to overcome this presumption."  Perkins, 648 F.3d at 902-903.

 "[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case."  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  At the same time, the ALJ is not required to "exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning." Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997) (citation omitted). "The duty to develop the record is limited to 'fully and fairly develop[ing] the record as to material issues."  Rice v. Apfel, 173 F.3d 864 (10th Cir. 1999) (table decision) (quoting Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997) (quoting Baca v. Department of Health & Human Servs., 5 F.3d 476, 479-80 (10th Cir.1993)) (emphasis added); see also Hawkins, 113 F.3d at 1168 ("[T]he ALJ must develop the record "consistent with the issues raised.")

The only "evidence" offered by Lund was the ALJ's use of the term "erratic" in his decision, which Lund obviously views as a gender-biased and pejorative term.  The Court disagrees.  The ALJ noted that the evidence of Lund's earnings indicated that she had "stayed out of the work force in the past for reasons unrelated to her alleged disability." (Tr. 29).  This is a true statement in light of Lund's current argument that she was out of the work force to care for her children.  Pl. Mem., pp. 16-17.

In any event, Lund has not explained how her early work history or history of pregnancies and childrearing was material to any of her claims, nor did she explain why, if she considered these topics relevant and material, she failed to raise the issue at the

hearing before the ALJ.  Lund's attorney did not ask her about her work history, nor did he raise the issue in his pre-hearing brief or post-hearing letter to the ALJ.  (Tr. 239-241).  The ALJ's duty to develop the record does not extend to reading a claimant's mind regarding issues she may think are material to the outcome.  Finally, there was no evidence whatsoever that Lund's early work history played any role in the ALJ's decision denying benefits.

### G.    The ALJ Did Not Err in His Step Five Findings

At step five of the sequential analysis the ALJ concluded that in light of the RFC he had determined, there existed jobs in significant numbers it the national economy that Lund could perform.  (Tr. 29).  At this step in the sequential analysis the Commissioner bears the burden of establishing that a claimant possesses the RFC to perform a significant number of jobs in the national economy.  Owens v. Barnhart, Civ. No. 03-5606 (ADM/FLN), 2005 WL 661616, at *5 (D. Minn. 2005).  "For claimants with exertional impairments, the Commissioner can satisfy his burden by applying the medical-vocational guidelines, or "Grids."  Id.  The Grids are "are fact-based generalizations concerning the availability of jobs for people of varying ages, educational backgrounds, and previous work experience with varying degrees of exertional impairment.  Id. (citations omitted); These Grids take administrative notice of the "numbers of unskilled jobs that exist throughout the national economy at the various functional levels."  20 C.F.R. §404, Subpart P, Appx. 2, 200.00(b).  VE testimony is required under step five only when the claimant has nonexertional impairments.  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (citations omitted); see also

Desrosiers v. Secretary of Housing & Health Servs., 846 F.2d 573, 577 (9th Cir. 1988) (significant non-exertional impairments may make reliance on the Grids inappropriate).

According to Lund, the ALJ's conclusion that Lund should have only brief and superficial contact with others represents a non-exertional limitation, which should have triggered the ALJ's use of VE testimony regarding the availability of jobs.  Pl. Mem., p. 18.

The only non-exertional limitation the ALJ incorporated into his RFC was limiting Lund to "brief and superficial contact with others."   (Tr. 28).   Doing so did not categorically require the ALJ to seek VE testimony.  The Grids may still be used where nonexertional limitations do not significantly limit a claimant's residual functional capacity to perform a full range of Grids-listed activities.  Sandifer v. Astrue, 329 Fed. Appx. 685, 686 (8th Cir. 2009) (an ALJ's use of the Grids was appropriate where nonexertional limitations did not compromise claimant's ability to perform sedentary work); Baker v. Barnhart, 457 F.3d 882, 894-895 (8th Cir. 2006) (Grids may be used where nonexertional limitations do not significantly limit claimant's RFC to perform full range of Grids-listed activities).  Additionally, because unskilled work "ordinarily involves dealing primarily with objects rather than people" an ALJ may use the Grids where a claimant's non-exertional limitation includes limited public contact.  Ramirez v. Astrue, Civ. No. 1:09-1508, 2010 WL 3734002, at *12 (E.D. Cal. Sept. 21, 2010); Campos v. Astrue, Civ. No. 10-8603, 2012 WL 467985, at *2 (C.D. Cal. Feb. 14, 2012) ("limited public contact is consistent with light unskilled work.").

Here, there is nothing in the record to indicate that Lund could not perform at the sedentary level with the additional restrictions the ALJ imposed.  Based on the evidence

discussed at length in the above sections, the Court finds substantial evidence in the record to support the ALJ's conclusion that Lund's non-exertional limitations would not significantly affect her ability to work.

**VII.    CONCLUSION**

There was substantial evidence in the record to support the ALJ's decision that Lund was able to work at a reduced RFC and the ALJ committed no error in making that decision.    Consequently, this Court denies Lund's motion for summary judgment and grants the Commissioner's motion for summary judgment.

J.S.M.